[Cite as *State v. Rickard*, 2015-Ohio-3298.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio

Appellee

v.

Cody R. Rickard

Appellant

Court of Appeals Nos. WD-14-016
WD-14-017

Trial Court Nos. 2013CR0574
2013CR0596

**DECISION AND JUDGMENT**

Decided:  August 14, 2015

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, Gwen
Howe-Gebers, Chief Assistant Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**JENSEN, J.**

**{¶ 1}** This is a consolidated appeal from the February 4, 2014 judgment entries of

the Wood County Court of Common Pleas, following a jury trial, in which appellant,

Cody R. Rickard, was found guilty of one count of murder, two counts of aggravated

vehicular homicide, two counts of felonious assault, and two counts of vehicular assault. The trial court convicted and then sentenced Rickard to 15 years to life in prison on the murder count, and 7 years to each of the felonious assault counts. The trial court ordered the sentences to be served consecutively. Rickard now appeals. For the reasons that follow, we affirm, in part, and reverse, in part, the judgments of the trial court.

{¶ 2} On October 28, 2013, numerous CSX employees and subcontractors were replacing railroad tracks near the town of Bradner in Wood County, Ohio. A barricade was placed at the intersection of James Street and Bradner Road (aka South Main Street) indicating "ROAD CLOSED AT RAILROAD CROSSING LOCAL TRAFFIC ONLY." A second "ROAD CLOSED" barricade was placed across both lanes of Bradner Road, approximately 372 feet south of the first road closed sign, just after the last private residence before the road intersects the tracks. Vernon Bowling, a CSX mechanic, had parked his truck, facing south, a few feet from the railroad crossing. The truck blocked a portion of the northbound lane of Bradner Road approximately 139 feet south of the second barricade.

{¶ 3} At approximately 11:18 a.m., several CSX employees were standing at the back end of the truck waiting for Bowling to repair a machine that had broken down on the track. Lewis Knott was seated on the back bumper of the truck, Jimmy D. Conley and Paul Castle stood near Knott.

{¶ 4} At the same time, appellant drove his white Dodge Charger south on Bradner Road. He drove around the first barricade, then into the grass around the second

2.

barricade.  As he accelerated his vehicle, appellant struck a metal pole bearing a curve warning sign located 65 feet south of the second barricade.  Then, appellant struck a wood utility pole located 59 feet south of the metal pole.  Both the metal pole and the wood pole were sheared from their bases.

{¶ 5} Appellant's vehicle struck Conley, Castle, and the back panel of the mechanic's truck before it came to stop in a drainage ditch.  Upon impact with appellant's vehicle, Castle's body was thrown more than 80 feet.  Castle died from complications of multiple blunt force traumas.  The collision caused Conley to fall onto Knott.  Conley suffered fractures to his pelvis and vertebrae.  Knott suffered injuries to his legs and hip.

{¶ 6} On November 7, 2013, in case No. 2013CR0574, the grand jury issued a four-count indictment against appellant.  In Counts 1 and 3, appellant was charged with vehicular assault on Lewis Knott and Jimmy Conley, in violation of R.C. 2903.08(A)(2)(a) and (C)(2), felonies of the fourth degree.  In Count 2, appellant was charged with felonious assault on Knott, in violation of R.C. 2903.11(A)(2) and (D)(1)(a), a felony of the second degree.  In Count 4, appellant was charged with felonious assault on Conley, in violation of R.C. 2903.11(A)(1) and (D)(1)(a), a felony of the second degree.

{¶ 7} On November 21, 2013, in case No. 2013CR0596, the grand jury issued a three-count indictment against appellant relating to the death of Paul Castle.  In Count 1, appellant was charged with aggravated vehicular homicide in violation of R.C.

3.

2903.06(A)(2)(b) and (B)(3), a felony of the third degree. In Count 2, appellant was charged with aggravated vehicular homicide in violation of R.C. 2903(A)(2)(a) and (B)(3), a felony of the third degree. In Count 3, appellant was charged with murder in violation of R.C. 2903.02(B) and (D), an unclassified felony.

{¶ 8} The two cases were joined. A jury trial was held January 27-30, 2014.

{¶ 9} One of the victims, Lewis Knott, recalled sitting on the rear bumper of the mechanic's truck; Paul Castle and Jimmy Conley were standing nearby. Suddenly, Knott saw something white and heard "something hit something real loud." Conley fell onto Knott and knocked Knott to the ground. A few moments later, Knott saw appellant run down the track towards Bradner.

{¶ 10} A second victim, Jimmy Conley, recalled seeing a car sitting at the first barricade. Conley explained:

> I took my attention away from the car because I thought he would turn around * * *. At some point there I heard somebody holler something, I didn't know what it was, and I turned and looked. When I looked the car was already, I mean, it was right there. And what I saw was the right rear quarter panel of the car coming towards me and stones flying, and I turned a little bit to try to get out of the way and it hit me. And the next thing I knew I was laying on my left side on the road looking north towards Bradner.

4.

{¶ 11} CSX employee James Bevens remembered standing on the tracks talking with some of the other guys from the crew. Bevens explained:

[A]ll of a sudden I just heard a motor racing real loud like you would hear on a NASCAR race, something like that, I mean, it was really – like you could be passing somebody on the highway. It was really accelerated. I looked, I thought, "what is going on here?" You know, it shocked you, you know, because you never seen nothing like this. I looked and I said, "What is this idiot doing here?" By the time I said that, I said, "Oh gosh, he hit the pole." * * * I blinked, and the next thing I know I seen the green blur, which was Paul [Castle] * * * going through the air.

{¶ 12} CSX employee Christopher Delano testified that after the white Dodge Charger came to a stop, he ran to the vehicle's passenger side window and leaned in. Appellant was sitting in the driver's seat, facing the driver's side door with his right shoulder towards the front windshield, his back towards Delano. Delano asked if appellant was ok. In response, appellant turned to Delano and said "the devil is my savior" in what Delano described as "very demonic voice." Delano explained

[Appellant] got out of the car. He put his hand up in the air. He said,

"Wahoo, I did it. Wahoo, I did it." And he jumped in the air and on his way down he put his arm around another employee an arm strong, and he said, "I did it." Another individual on our team asked him, "You did what? You killed those boys." He said, "I should have killed everyone of

you all." I then walked up, I put my hand on his shoulder, I said, "Sir, you need to calm down. You just went through a telephone pole. He looked like he was in shock. I was trying to calm him down and he just kept walking.

{¶ 13} CSX employee Brandon Stokes testified that after appellant's car hit the telephone pole, he saw "one body flying into another body, and another body being shot out." He immediately ran towards the scene. Stokes explained, "When I got up there, the [appellant] had gotten out of his vehicle already and he was walking past me and he said that 'one of you need to get that fucking shit cleaned up.' I was kind of in shock. I was like, I can't believe this guy just said. He's – you know, at that time we didn't know he maybe just killed somebody."

{¶ 14} Other CSX employees offered similar testimony.

{¶ 15} Risingsun police patrol officer Jason Tate and Bradner police officer Jamie Blausey were the first two units to arrive at the scene. Officer Tate testified that when he arrived appellant was sitting on the tracks surrounded by several CSX employees. The CSX employees informed him that appellant had hit their coworkers with his vehicle and tried to run. Officer Tate noticed an injury on the back of appellant's head. When the officer asked appellant what had happened, appellant responded "I love Jesus Christ." Appellant was unresponsive to other questions. At that point, Tate explained to appellant that he was going to be detained for "his safety." Tate explained, "[a]s I was attempting to put handcuffs on him, he started to resist me and struggle with me. We went to the

6.

ground and Officer Blausey ran over and assisted me in restraining him and putting him in the backseat of my patrol car."

{¶ 16} Matthew Ruble is a volunteer firefighter and paramedic for the Bradner Fire Department. Ruble testified that he assessed appellant and found his vital functions normal. Yet, appellant was unable to answer questions about what had happened. Appellant was transported to Wood County Hospital by squad. Ruble indicated, "[w]e transported him lights and sirens. It wasn't because of patient condition, it was because of safety. Even though he was handcuffed he was still being verbally aggressive with us. He did lunge at us a few times during transport. He made some wild accusations and accused us of doing stuff during transport."

{¶ 17} Christopher J. Kinn is a lieutenant for the Ohio State Highway Patrol. Over trial counsel's objection, the trial court qualified Kinn as an expert in crash reconstruction. Lieutenant Kinn explained that when automobile manufacturers started putting airbags in cars, they also installed event date recorders ("EDR") to perform various diagnostic checks inside the vehicle when an airbag deploys. He described the type of data collected and how the data is extracted from the EDR. He explained the results of the data collected on appellant's EDR and the graphs interpreting the data. While Lieutenant Kinn opined that hitting the "curve ahead" sign likely did not cause appellant's airbag to deploy, he expressed no opinion as to what event did, in fact, cause appellant's airbag to deploy.

7.

{¶ 18} Lieutenant Kinn opined that the impact which caused appellant's airbag to deploy was "pretty significant" because the "longitudinal crash pulse got as high as negative 50-some miles an hour." He further opined that for the five seconds before impact, the accelerator pedal was pushed all the way to the floor until "right before the air bag came up." Five seconds before impact, appellant's vehicle was traveling 41 m.p.h. and gained speed until it reached 61 m.p.h. The last data point before the crash, appellant's vehicle was traveling 57 m.p.h. Finally, Lieutenant Kinn indicated that the data indicated appellant never applied his braked in the five seconds before the crash.

{¶ 19} Following the presentation of evidence, a jury found appellant guilty of all charges.

{¶ 20} On appeal, appellant sets forth the following assignments of error:

I. The trial court abused its discretion and erred to the prejudice of Appellant by denying a jury instruction on vehicular homicide as the lesser included offense of aggravated vehicular homicide.

II. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, §10 of the Constitution of the State of Ohio.

III. The trial court abused its discretion in permitting the state's expert witness to testify despite the failure of the state to comply with Ohio Rule of Criminal Procedure 16(K).

8.

IV. The trial court erred to the prejudice of Appellant by imposing consecutive sentences without making judicial findings under R.C. 2929.14(C)(4).

V. The trial court erred by denying Appellant's request for a presentence investigation report prior to imposing sentence.

VI. The trial court erred in denying Appellant's Rule 29 Motion for Acquittal at the completion of the state's case in chief.

VII. Appellant's conviction was against the manifest weight of the evidence introduced by the state at trial.

**First Assignment of Error**

{¶ 21} In his first assignment of error, appellant asserts that the trial court abused its discretion when it denied jury instructions on vehicular homicide as a lesser included offense of aggravated vehicular homicide.

{¶ 22} Preliminarily, we note that in regard to Paul Castle's death, appellant was charged with and the jury was instructed on one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a), one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(b), and one count of murder in violation of R.C. 2903.02(B)(D) and (A)(D)(1). The jury found him guilty of all three offenses.

{¶ 23} Appellant's requested instructions, denied by the trial court, were based on the lesser included offenses of vehicular homicide in violation of R.C. 2903.06(A)(3)(a) and (b). R.C. 2903.06(A)(3) provides:

9.

(A) No person, while operating or participating in the operation of the motor vehicle * * * shall cause the death of another * * *:

(3) In the following ways:

(a) Negligently;

(b) As the proximate result of committing, while operating * * * a motor vehicle * * * in a construction zone, a speeding offense * * * if the person whose death is caused * * * is in the construction zone at the time of the offender's commission of the reckless operation offense in the construction zone * * *.

{¶ 24} On appeal, appellant asserts that evidence presented at trial warranted jury instructions on the lesser included offenses. Appellant supports his position by pointing to the speed appellant was traveling in the construction zone as well as the code's definition of the culpable mental state "negligently." R.C. 2901.22(D) provides:

A person acts negligently when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that the person's conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, the person fails to perceive or avoid a risk that such circumstances may exist.

{¶ 25} "The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis." (Citation

omitted.)  *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6.

"The first tier * * * is purely a legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense."  *Id.*, citing *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987).  "The second tier looks to the evidence in a particular case and determines whether 'a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'"  *Id.*, quoting *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13.

{¶ 26} "[A] charge on the lesser offense is required 'only where the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense.'"  *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 192, quoting *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus.

{¶ 27} "The trial court must view the evidence in the light most favorable to the defendant when deciding whether to instruct the jury on a lesser included offense."  *Id.*, citing *State v. Campbell*, 69 Ohio St.3d 38, 47, 630 N.E.2d 339 (1994).  "The lesser-included-offense instruction is not warranted every time 'some evidence' is presented to support the lesser offense."  *Id.*, citing *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992).  "Rather, a court must find 'sufficient evidence' to 'allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense.'  (Emphasis sic.)"  *Id.*, quoting *Shane* at 632.

11.

{¶ 28} In this case, the state does not dispute the first tier of the analysis that vehicular homicide in violation of R.C. 2903.06(A)(3)(a) is a lesser included offense of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a) or that vehicular homicide in violation of R.C. 2903.06(A)(3)(b) is a lesser included offense of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(b).

{¶ 29} With respect to the second tier of the analysis, we must determine whether a jury could reasonably find appellant not guilty of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a) and (b) based on the evidence presented at trial.

{¶ 30} R.C. 2903.06(A)(2) provides:

(A) No person, while operating or participating in the operation of a motor vehicle * * * shall cause the death of another * * *:

(2) In one of the following ways:

(a) Recklessly;

(b) As the proximate result of committing, while operating * * * a motor vehicle * * * in a construction zone, a reckless operation offense * * * if the person whose death is caused * * * is in the construction zone at the time of the offender's commission of the reckless operation offense in the construction zone * * *.

{¶ 31} R.C. 2901.22, which defines the various culpable mental states, defines recklessly as follows:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustified risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustified risk that such circumstances are likely to exist. R.C. 2901.22(C).

{¶ 32} In turn, a reckless operation offense is defined as the operation of a motor vehicle "on any street or highway in willful or wanton disregard of the safety of persons or property." R.C. 4511.20(A). *See also State v. Pugh*, 6th Dist. Erie No. E-11-014, 2012-Ohio-829, ¶ 5.

{¶ 33} Appellant contends that the testimony at trial supports the finding that appellant was merely speeding through a construction zone when he hit a utility pole and lost control of his vehicle. Thus, appellant argues, the evidence supports a finding of negligence, not recklessness. In response, the state asserts that instructing the jury on the lesser included offenses was unnecessary because of appellant's "callous nature and reaction to this horrible incident."

{¶ 34} At trial, the state presented evidence that appellant drove around two "road closed" barricades during daylight hours, when several CSX employees wearing high-visibility clothing where standing on and near a railroad crossing in a construction zone. Instead of slowing down or turning around, appellant pressed his vehicle's accelerator

13.

pedal "all of the way down" and drove through the construction zone, without braking. Whether the impact of the pole or the impact with the ditch caused appellant's airbag to deploy, data from the Charger's EDR, as interpreted by Ohio State Highway Patrol Lieutenant Chris Kinn, demonstrates that in the five seconds before impact, appellant's vehicle traveled at speeds up to 60 m.p.h. A few milliseconds before impact, appellant's vehicle was traveling 57 m.p.h. The speed limit on Bradner Road is 50 m.p.h.

{¶ 35} We find that the evidence presented at trial does not reasonably support both acquittal on the aggravated vehicular assault charges and conviction of the lesser included offenses of vehicular assault. Thus, the trial court did not err in refusing to instruct the jury on the lesser included offenses. Further, whether a jury could reasonably have found appellant not guilty of aggravated vehicular homicide, but guilty of the lesser included offense vehicular homicide, is of little consequence to the outcome of this case because the jury also found appellant guilty of murder. Thus, any error in failing to instruct the jury on the lesser included offense would be harmless, at best. Appellant's first assignment of error is not well-taken.

**Second Assignment of Error**

{¶ 36} In his second assignment of error, appellant contends he was denied the effective assistance of trial counsel.

{¶ 37} In order to establish ineffective assistance of counsel, an appellant must satisfy the two-part test created in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Appellant must show counsel's performance fell below an

14.

objective standard of reasonableness, and a reasonable probability exists that but for counsel's error, the result of the proceedings would have been different. *Id.* at 687-688, 696. "Judicial scrutiny of counsel's performance must be highly deferential. * * * [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 38} Under this assignment of error, appellant first argues that trial counsel was ineffective by failing to engage expert witnesses to advance his theory of the case. Specifically, appellant asserts that trial counsel should have hired a reconstruction expert to interpret the EDR data in a light more favorable to the defense's theory that the airbag deployed upon impact with the utility pole, obscured his view, and made it impossible to avoid a collision with the victims. Appellant further asserts that trial counsel should have called a medical expert to testify to the effect of a potential head injury from the collision to explain appellant's irrational post-accident behavior.

{¶ 39} The failure to call an expert does not necessarily constitute ineffective assistance of counsel, particularly when trial counsel relies on cross-examination of the opposing party's expert witness. *See State v. Thompson*, 33 Ohio St.3d 1, 10, 514 N.E.2d 407 (1987). Thus, this court must presume trial counsel's decision to merely cross-examine the state's expert witnesses and not present expert witnesses on behalf of the appellant falls within the wide range of reasonable professional assistance and is the product of sound trial strategy. *Strickland* at 689.

15.

{¶ 40} In his second argument under this assignment of error, appellant asserts trial counsel was ineffective when he attempted to introduce physical evidence the day of trial without having previously provided it to the state through reciprocal discovery. The physical evidence in question included a bloody sweatshirt appellant allegedly wore on the day of the incident and a CSX operations manual. It is unclear how this evidence, if it had been properly introduced, would have been used to advance trial counsel's theory of the case. Thus, we must presume trial counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*

{¶ 41} In his third argument under this assignment of error, appellant asserts trial counsel was ineffective when he discussed, in his opening statement, appellant's anticipated testimony. However, it is clear from the record that appellant ultimately chose not to testify in his defense. The trial court explained to the jury that appellant's decision could not be considered for any purpose. Appellant has not shown how trial counsel's opening statement prejudiced the defense.

{¶ 42} Pursuant to the above, we cannot say that trial counsel's performance fell below an objective standard of reasonableness or that a reasonable probability exists that but for counsel's alleged errors, the result of the proceedings would have been different. Therefore, we find appellant was not denied the effective assistance of counsel. Appellant's second assignment of error is not well-taken.

16.

**Third Assignment of Error**

{¶ 43} In his third assignment of error, appellant asserts that the trial court abused its discretion when it permitted Lieutenant Kinn to testify despite the state's failure to comply with Crim.R. 16(K).[1] Specifically, appellant asserts that the state never produced Lieutenant Kinn's analysis of the EDR data before trial.

{¶ 44} In response, the state asserts that expert reports "were turned-over to the defense once the State received them." Unfortunately, the contents of the state's discovery disclosures are not included in the record. However, a review of the state's response to appellant's motion to exclude suggests that on December 16, 2012, the state disclosed Lieutenant Kinn as a potential witness. The state's response indicates that it simultaneously "listed the ECM module interpretation, a drawing from the WCSO with measurements of the scene, and numerous other documents and photographs." The state's response further indicates that on January 6, 2013, it provided a "report, including a schematic drawing, from the CSX risk management department." Finally, the state's response states that on January 15, 2014, the state provided "measurements of the scene

---

[1] Crim.R. 16(K) provides,

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinions, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

17.

from the OSHP, along with the CV of Lt. Kinn." Without an opportunity to examine the materials actually disclosed to trial counsel, we cannot conclude the state violated Crim.R. 16(K).

{¶ 45} Upon our review of the record we find no willful violation of the discovery rules on behalf of the state. Thus, we cannot find that the trial court abused its discretion in allowing Lieutenant Kinn to testify as an expert witness. Appellant's third assignment of error is not well-taken.

**Fourth Assignment of Error**

{¶ 46} In his fourth assignment of error, appellant contends that the trial court alluded to but did not make the required judicial findings in open court and on the record, as required by R.C. 2929.14(C)(4), before imposing consecutive sentences.

{¶ 47} Recently, in *State v. Banks*, 6th Dist. Lucas No. L-13-1095, 2014-Ohio-1000, ¶ 11-12, we explained

> R.C. 2929.14(C)(4) now requires that a trial court engage in a three-step analysis in order to impose consecutive sentences. First, the trial court must find the sentence is necessary to protect the public from future crime or to punish the offender. Second, the trial court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Third, the trial court must find that at least one of the following applies: (a) the offender committed one or more of the multiple offenses while the offender was

awaiting trial or sentencing, while under a sanction imposed pursuant to R.C. 2929.16, 2929.17, or 2929.18, or while under postrelease control for a prior offense; (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflect the seriousness of the offender's conduct; or (c) the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

However, the trial court is not required to recite any "magic" or "talismanic" words when imposing consecutive sentences provided it is "clear from the record that the trial court engaged in the appropriate analysis." *State v. Murrin*, 8th Dist. Cuyahoga No. 83714, 2004-Ohio-3962, ¶ 12.

{¶ 48} Then, in *State v. Payne*, 6th Dist. Lucas Nos. L-13-1024, L-13-1025, 2014-Ohio-1147, we referenced the long-standing premise that a trial court speaks through its judgment entries and found that while a court might fully explain its reasons for ordering consecutive sentences and make the statutorily-mandated findings required under R.C. 2929.14(C)(4) at the sentencing hearing, those findings must be reflected in its judgment entry. *Id.* at ¶ 13-16.

19.

{¶ 49} Upon review of the February 4, 2014 nunc pro tunc judgment entries and the transcript of the January 30, 2014 sentencing hearing, we find that the trial court did engage in the first step of the consecutive sentence analysis—that the sentence is necessary to protect the public from future crime or to punish the offender—when, during the sentencing hearing, it held that consecutive sentences were necessary because "a single prison term would not adequately punish the offender or protect the public given the nature of this case and the wanton and reckless behavior that led to us all being in court here today." We further find that the trial court's findings were sufficiently reflected in its judgment entries when it asserted: "consecutive sentences are necessary to punish the Defendant."

{¶ 50} The record reflects that the trial court did engage in the second step of the consecutive sentence analysis—that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public—when, during the sentencing hearing, it stated:

> The Court has to consider the purposes and principles of felony sentencing, which are to punish the offender and to protect the public from future crime by the offender and others. And the court is instructed to impose the minimum sanctions that the Court determines would accomplish those purposes without imposing an unnecessary burden on the State or local government resources. The Court has to consider the need for incapacitation, deterrence, rehabilitation, and restitution and fashion a

20.

sentence that is commensurate with and not demeaning the seriousness of the offender's conduct and its impact on the victims, and consistent with sentences for similar crimes by similar offenders.

* * *

The Court does make a finding that a single prison term would not adequately punish the offender or protect the public given the nature of this case and the wanton and reckless behavior that led to us all being in court here today.

The trial court's findings were sufficiently reflected in its judgment entries when it asserted that consecutive sentences "are not disproportionate to the seriousness of the defendant's conduct and the danger the defendant poses to the public." The court further stated, "no single prison term would adequately reflect the seriousness of the Defendant's conduct."

{¶ 51} The record reflects that trial court engaged in the third step of the consecutive sentence analysis—that at least one of the three conditions set forth in R.C. 2929.14(C)(4) applies—when it stated:

In considering sentencing factors making the conduct more serious, there was no action by the victims that exacerbated the situation. The victims have suffered serious physical, psychological and economic harm.

In looking at recidivism factors, it does not appear that that defendant has a prior criminal record or a prior juvenile adjudication. The

Court does make a finding that the offender, until just now, has not shown any remorse.

However, the sentencing entry does not sufficiently reflect these findings. *See Payne,* 6th Dist. Lucas Nos. L-13-1024, L-13-1025, 2014-Ohio-1147, ¶ 13-16 (trial court made appropriate findings at the sentencing hearing before imposing consecutive sentences, but matter remanded for the court to amend its judgment entry to reflect those findings). Thus, we remand this matter to the trial court to amend its judgment entry to reflect its R.C. 2929.14(C)(4) findings. Appellant's fourth assignment of error is well-taken.

### Fifth Assignment of Error

{¶ 52} In his fifth assignment of error, appellant asserts the trial court erred in denying his request for a presentence investigation report. Appellant asserts that although he was sentenced to serve a mandatory term of imprisonment of 15 years to life for murder, appellant would otherwise conceivably be an "eligible offender" under R.C. 2929.20, for purposes of judicial release at some future point in time, but for the lack of a presentence investigation report.

{¶ 53} R.C. 2951.03(A)(1) provides, in relevant part, that "[n]o person who has been convicted of or pleaded guilty to a felony shall be placed under a community control sanction until a written presentence report has been considered by the court." Similarly, Crim.R. 32.2 provides that "[i]n felony cases the court shall, and in misdemeanor cases the court may, order a presentence investigation and report before imposing community control sanctions or granting probation." In turn, "community control sanction" is

22.

defined in R.C. 2929.01(E) as "a sanction that is not a prison term and that is described in section 2929.15, 2929.16, 2929.17, or 2929.18 of the Revised Code or a sanction that is not a jail term and that is described in section 2929.26, 2929.27, or 2929.28 of the Revised Code."

{¶ 54} Here, appellant was not sentenced to a community control sanction as defined in R.C. 2929.01(E). Thus, the trial court was not required to order a presentence investigation and report. Accordingly, appellant's fifth assignment of error is not well-taken.

## Sixth Assignment of Error

{¶ 55} In his sixth assignment of error, appellant asserts that the trial court erred in overruling appellant's Crim.R. 29 motion for judgment of acquittal. Appellant argues that the state did not present sufficient evidence to sustain convictions for the felonious assault or murder charges. Specifically, appellant asserts there was insufficient evidence introduced to support the mens rea element of the offenses, i.e., that appellant acted "knowingly."

{¶ 56} Crim.R. 29(A) provides:

> The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such

23.

offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

{¶ 57} Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper analysis under a sufficiency of the evidence standard is "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Williams*, 74 Ohio St.3d 569, 576, 660 N.E.2d 724 (1996), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In order to affirm the denial of a Crim.R. 29 motion, we need only find that there was legally sufficient evidence to sustain the guilty verdict. *Thompkins* at 386.

{¶ 58} Appellant was convicted of felonious assault on Conley in violation of R.C. 2903.11(A)(1), a felony of the second degree. This section provides that "No person shall knowingly * * * [c]ause serious physical harm to another[.]" *Id*.

{¶ 59} Appellant was convicted of felonious assault on Knott in violation of R.C. 2903.11(A)(2), a felony of the second degree. This section provides that "No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." *Id.*

{¶ 60} Appellant was convicted of the murder of Castle in violation of R.C. 2903.02(B). That section provides that "[n]o person shall cause the death of another as a

24.

proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). The predicate offense for the murder charge was felonious assault in violation of R.C. 2903.11(A)(1) and (2).

{¶ 61} R.C. 2901.22 defines culpable mental states. R.C. 2901.22(B) states, in relevant part: "A person acts knowingly regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

{¶ 62} At trial, numerous CSX employees indicated that appellant, in broad daylight, quickly accelerated his vehicle through a marked construction zone with workers wearing high visibility clothing. The street, closed at the railroad crossing, was essentially a dead-end street. In order to reach the area where the victims were standing, appellant had to drive his vehicle off of the road around a set of "ROAD CLOSED" barricades that had been erected across both lanes of traffic. This evidence, coupled with testimony describing appellant's lack of remorse immediately following the collision— including his statement that "I should have killed every one of you all" could have convinced a reasonable trier of fact that appellant knowingly caused serious physical harm to Castle and Conley, and knowingly caused or attempted to cause physical harm to Knott by means of a deadly weapon. Consequently, the evidence was sufficient to

25.

support these convictions. The trial court did not err in denying appellant's Crim.R. 29 motion for acquittal. Appellant's sixth assignment of error is not well-taken.

**Seventh Assignment of Error**

{¶ 63} In his seventh assignment of error, appellant maintains that his convictions were against the manifest weight of the evidence. He asserts that the evidence presented at trial shows that the event was an "accident" consistent with the elements for the offenses of vehicular assault and vehicular homicide; not felonious assault and murder.

{¶ 64} The Ohio Supreme Court has summarized the standard for reversal of a criminal conviction on the ground that it is against the manifest weight of the evidence as follows:

> The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

"In determining whether a conviction is against the manifest weight of the evidence, we do not view the evidence in a light most favorable to the state. Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing

26.

*Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 65} While a reviewing court considers the credibility of the witnesses in a weight of the evidence review, "that review must nevertheless be tempered by the principle that weight and credibility are primarily for the trier of fact." *State v. Pena*, 6th Dist. Lucas No. L-12-1309, 2014-Ohio-423, ¶ 22, quoting *State v. Kash*, 1st Dist. Hamilton No. CA2002-10-247, 2004-Ohio-415, ¶ 25. The trier of fact is in the best position to "view the witnesses and observe the credibility of the proffered testimony," *id*. at ¶ 22, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). A jury may believe all, part, or none of a witness's testimony. *Id.* at ¶ 22.

{¶ 66} Appellant does not dispute that Conley, Knott, and Castle were injured as a result of the collision and that, ultimately, Castle's injuries were fatal. However, appellant asserts that the evidence does not support a determination that appellant's vehicle was "directed at the victims." Appellant argues that Knott's testimony that appellant's vehicle "glanced off" the utility pole and swerved into the truck supports his theory that appellant was "attempting to avoid impact with the pole" and that he never even saw Conley, Knott, and Castle.

{¶ 67} Whether or not the front of appellant's vehicle was "directed at the victims" in the moments before impact is, in reality, of very little consequence to the outcome of this case. As stated above, a person acts knowingly when he is aware that his

27.

conduct will probably cause a certain result. R.C. 2901.22(B). "It is not necessary that the accused be in a position to foresee the precise consequences of his conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Mobley-Melbar*, 8th Dist. Cuyahoga No. 92314, 2010-Ohio-3177, ¶ 19, quoting *State v. Losey*, 23 Ohio App.3d 93, 96, 491 N.E.2d 379 (10th Dist.1985).

{¶ 68} The jury visited the accident scene and was shown photographs and sketches of where the victims were standing in relation to the mechanic's truck and construction barricades. Bradner Road is bordered with dense foliage on the east and railroad tracks on the west. One witness after another described appellant quickly accelerating his vehicle, full throttle, through the construction zone. Appellant never applied his brakes. Even if he was trying to avoid the utility pole, there is no reasonable explanation to explain why appellant was driving 60 m.p.h. down a dead-end street less than 15 feet from three construction workers wearing high-visibility clothing. Considering this evidence, as well as the evidence discussed under the previous assignments of error, we cannot say the jury clearly lost its way and created a manifest miscarriage of justice when it found appellant guilty of felonious assault and murder. Accordingly, appellant's seventh assignment of error is not well-taken.

28.

## Conclusion

**{¶ 69}** For the reasons set forth above, the judgment of the trial court is affirmed, in part, and reversed, in part. We remand this matter to the trial court to amend its judgment entry to reflect its R.C. 2929.14(C)(4) findings. The costs of this appeal are assessed to appellant and appellee equally under App.R. 24.

Judgment affirmed, in part,
and reversed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

James D. Jensen, J.
CONCUR.

_____
JUDGE

Thomas J. Osowik, J.,
DISSENTS.

**OSOWIK, J.**

**{¶ 70}** I would respectfully dissent. I find appellant's second assignment of error to be meritorious and would reverse. At the outset, I would note the court's advice in *Strickland* that reviewing courts should strive to ensure that ineffectiveness claims not

become so burdensome to defense counsel that the entire criminal justice system suffers as a result. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With that admonition in mind, the Supreme Court of Ohio has instructed that the claims of ineffectiveness are to be reviewed individually and to be determined upon their individual merits. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

{¶ 71} After a review of the record, I find that counsel's performance in the representation of his client in this case fell below an objective standard of reasonable representation contemplated by *Strickland*.

{¶ 72} The facts of this case are undeniably upsetting. A railroad worker lost his life and fellow coworkers suffered life-altering permanent injuries. The appellant was indicted for murder. It is self-evident that the crime of murder is a serious felony. A conviction for murder carries with it a mandatory period of imprisonment for an indefinite term of 15 years to life in the Ohio Department of Rehabilitation and Corrections. R.C. 2929.02(B)(1). Legal representation under these circumstances requires the utmost diligence on the part of counsel.

{¶ 73} The Sixth Amendment does not merely guarantee counsel to persons charged with serious crimes; it requires the *effective* assistance of counsel. *Strickland* at 686. The right to effective representation assures that those who are criminally charged and tried actually receive the protections provided under the law and required by the Constitution. As the United Stated Supreme Court held 83 years ago:

> Even the intelligent and educated layman has small and sometimes
> no skill in the science of law. If charged with crime, he is incapable,

generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932).

{¶ 74} Counsel has a "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *State v. Kole,* 92 Ohio St.3d 303, 306, 750 N.E.2d 148 (2001), quoting *Strickland* at 688.

{¶ 75} Effective representation of a client carries with it an obligation to make a reasonable investigation where the facts of a case require it. *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Specifically, the defense attorney "has the immediate responsibility of deciding if and when to object, which witnesses, if any, to call, and what defenses to develop." *Wainwright v. Sykes*, 433 U.S. 72, 93, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). In addition to assuming these tactical decisions, representation of a criminal

31.

defendant entails certain basic duties first and foremost of which is the duty to represent his or her client with *reasonable* diligence. Prof.Cond.R. 1.3.

{¶ 76} In this case, the record as presented to this court establishes a complete failure to investigate the possibility appellant had any history of mental instability or some mental defect from which he was suffering at the time of his horrific and bizarre actions. The facts of this case support at least a modest inquiry and exploration of presenting what may have been the only defense available to appellant and that is a defense available under R.C. 2901.01(A)(14). That section states:

(14) A person is "not guilty by reason of insanity" relative to a charge of an offense only if the person proves, in the manner specified in section 2901.05 of the Revised Code, that at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts.

{¶ 77} Thus, an insanity defense requires proof that the defendant did not know, as a result of a severe mental disease or defect, the wrongfulness of his or her acts. The defense does not require proof of psychosis or neurosis. *State v. Coombs,* 18 Ohio St.3d 123, 480 N.E.2d 414 (1985). This burden is on the defendant and must be proved by a preponderance of the evidence. *State v. Filiaggi,* 86 Ohio St.3d 230, 242, 714 N.E.2d 867 (1999). Therefore, the burden is not necessarily high. Nevertheless, no burden can be met by unpresented evidence. A meager investigation would have been a starting point.

32.

{¶ 78} The record of the trial is replete with witness testimony concerning appellant's actions and statements prior to the event and immediately afterwards.

{¶ 79} A witness testified that he watched appellant drive right through a stop sign in the middle of the day without even slowing his vehicle. He then proceeded directly through a red light without applying his brakes. The witness then observed appellant's car coming to a complete stop in front of the barricaded roadway. He remains stationary "for a few minutes." It is unclear whether appellant got out of his vehicle at this point, but the witness then stated "then I seen him get back in and then reverse." And then he went forward "with a great amount of speed" according to another witness. The car proceeded to strike a traffic sign and a telephone pole shearing it in half and continuing further until he struck three railroad workers, one of whom ultimately died as a result of the injuries he received.

{¶ 80} When approached appellant stated in a "demonic" voice that "the devil is my savior." When he exited the vehicle he appeared to be celebratory stating "Yeah." Another witness described appellant "hooting and hollering and saying 'this was great.'" He was throwing ballast rocks at the railroad workers. He sat down and then raised his fists and began cursing at one witness. He then "squared up like toe-to-toe getting ready to fight [and] that is when he took off running." One witness felt it necessary to strike appellant on the head with a piece of metal to restrain him.

{¶ 81} A second deputy arriving at the scene after appellant was restrained in the back seat of the patrol car observed appellant "was just rambling just crazy thoughts or crazy statements." He went on to pretend that he was fainting while the EMT crew was treating

33.

him. Appellant refused to open his eyes and began "squinting really, really hard." When they got appellant to his feet "he started laughing, he started joking." The Wood County hospital emergency room personnel indicated that appellant's "mental behavior was of great concern." Appellant insisted the deputy and medical personnel tell him that they loved him. In the emergency room while handcuffed, he was "dry humping the door in a sexual manner, and he was laughing about it. His behavior was completely erratic." The testimony at trial was devoid of any head trauma that would be responsible for such strange behavior. Another witness testified "we could tell he was messed up on something." Blood tests came back completely negative for the presence of any toxic substances.

{¶ 82} In this case, as a result of the disturbing testimony of each of the eyewitnesses, reasonable diligence would compel counsel to make a simple and almost effortless investigation concerning a possible mental defect being present at the time that appellant committed these acts. Yet the record is devoid of any such effort on the part of counsel.

{¶ 83} An attorney should be able to recognize that a fact pattern such as this could result in a finding of insanity by a medical professional and the issue ultimately being presented to the jury for its consideration. *State v. Wotring,* 11th Dist. Lake No. 99-L-114, 2001 WL 1647234 (Dec. 21, 2001).[2]

---

[2] In *State v. Wotring*, the court initially released an opinion in which the majority reversed the judgment entered by the trial court, holding that Wotring was denied effective assistance of counsel based on the specific facts of that case. The state filed an application for reconsideration and the court allowed the parties to submit additional evidentiary materials. The record was then supplemented with affidavits from defense counsel in which counsel stated that he did in fact obtain an evaluation with funds from his own personal budget, but that the evaluation was not made part of the record. He also discussed these results with

34.

{¶ 84} The Ohio Supreme Court has held that a complete and total lack of reasonable investigation gives rise to a presumption of prejudice under *Strickland. State v. Johnson*, 24 Ohio St.3d 87, 494 N.E.2d 1061 (1986).

{¶ 85} For these reasons, I would find the second assignment of error well-taken and reverse the judgment of the trial court and remand this case to be re-tried.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.

Wotring. Following this supplementation, the court reversed itself and affirmed the judgment of the trial court. It found that trial counsel had fulfilled the obligation to diligently discharge his duty to his client by requesting an evaluation although the result of the strategy was to keep such evidentiary materials out of the record and beyond review of the appellate court. *See State v. Wotring*, 11th Dist. Lake No. 99-L-114, 2003-Ohio-326.