[Cite as *State v. Rickard*, 2019-Ohio-298.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals Nos. WD-17-011
                                                                        WD-17-012
    Appellee

                                                 Trial Court Nos. 2013CR0574
v.                                                               2013CR0596

Cody Ross Rickard                                **DECISION AND JUDGMENT**

    Appellant                                Decided:  February 1, 2019

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
David T. Harold, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**SINGER, J.**

**{¶ 1}** This is a consolidated appeal from the judgments of the Wood County Court

of Common Pleas, following a jury trial, convicting appellant, Cody Rickard, of two

counts of felonious assault in violation of R.C. 2903.11(A)(2) and (D)(1)(a), felonies of

the second degree, and one count of murder in violation of R.C. 2903.02(B), an

unspecified felony, and sentencing him to a cumulative prison term of 29 years to life. For the reasons that follow, we affirm.

## I.  Facts and Procedural Background

{¶ 2} On the morning of October 28, 2013, a crew of CSX workers were repairing a railroad crossing near the town of Bradner in Wood County, Ohio.  The crossing was located within several hundred feet of the intersection of John Street and South Main Street, otherwise known as Bradner Road.  Appellant, driving a white Dodge Charger, passed a barricade at the intersection, which stated "Road Closed, Local Traffic allowed." Travelling down Bradner Road, appellant then sped past a second barricade, and struck several traffic directional signs and a telephone pole.  After striking the telephone pole, appellant's car swerved into the mechanic's truck where several CSX workers were standing.  Three workers were struck in the collision.  Two of them, Jimmy Conley and Luis Knott, suffered substantial injuries.  Tragically, the third worker, Paul Castle, later died from the impact.

{¶ 3} On November 6, 2013, in case No. 2013CR0574, the Wood County Grand Jury indicted appellant on two counts of vehicular assault, in violation of R.C. 2903.08(A)(2)(a) and (C)(2), and two counts of felonious assault, in violation of R.C. 2903.11(A)(2) and (D)(1)(a).  Several days later, on November 12, 2013, Paul Castle succumbed to his injuries.  Thus, the Wood County Grand Jury, in case No. 2013CR0596, indicted appellant on one count of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(b) and (B)(3), one count of aggravated vehicular

2.

homicide in violation of R.C. 2903.06(A)(2)(a) and (B)(3), and one count of felony murder in violation of R.C. 2903.02(B).

{¶ 4} Appellant pleaded not guilty to the charges, and a jury trial was held on January 27-30, 2014. The jury returned a verdict of guilty on all counts, and the trial court went immediately to sentencing. In case No. 2013CR0574, the court found that the two offenses of vehicular assault merged with the two offenses of felonious assault, with the state electing to proceed to sentencing on the counts of felonious assault. The trial court ordered appellant to serve seven years in prison on each count, with those sentences to be served consecutively. In case No. 2013CR0596, the trial court found that the two offenses of aggravated vehicular homicide merged with the offense of murder, and the state elected to proceed to sentencing on the count of murder. The trial court then ordered appellant to serve a term of 15 years to life in prison, and further ordered that the sentence be served consecutively to the sentence imposed in case No. 2013CR0574, for a total prison term of 29 years to life. Appellant timely appealed his convictions, which we affirmed in *State v. Rickard*, 6th Dist. Wood Nos. WD-14-016, WD-14-017, 2015-Ohio-3298.

{¶ 5} However, while his appeal was pending, appellant filed a petition for postconviction relief, in which he argued that trial counsel was ineffective for failing to investigate his mental status at the time of the incident. The trial court held a hearing on appellant's motion, and subsequently denied it on June 19, 2015. Appellant appealed the denial of his postconviction motion, and in *State v. Rickard*, 6th Dist. Wood Nos.

3.

WD-15-046, WD-15-047, 2016-Ohio-3374, we reversed. In our decision, we noted the following facts:

> When approached, appellant stated in a "demonic" voice that "the devil is my savior." When he exited the vehicle he appeared to be celebratory, stating "Yeah." Another witness described appellant "hooting and hollering and saying 'this was great.'" A deputy who arrived at the scene after appellant was restrained in the back seat of the patrol car observed appellant "was just rambling just crazy thoughts or crazy statements." The Wood County Hospital emergency room personnel indicated appellant's "mental behavior was of great concern." Appellant insisted the deputy and medical personnel tell him that they loved him. In the emergency room while handcuffed, he was "dry humping the door in a sexual manner, and he was laughing about it. His behavior was completely erratic." *Id.* at ¶ 12.

We then held that the facts of the case warranted at least a modest inquiry and exploration of the defense of not guilty by reason of insanity, and the trial court abused its discretion when it found that appellant was not prejudiced by his trial counsel's failure to investigate the state of his mental health. *Id.* at ¶ 17, 21. Therefore, we remanded the case to the trial court for further proceedings.

{¶ 6} On remand, appellant entered a plea of not guilty by reason of insanity, and he was committed to the Northwest Psychiatric Hospital for a mental health examination.

4.

Appellant was later committed to the Twin Valley Behavioral Healthcare Hospital in Columbus, Ohio, for an additional mental health examination.

{¶ 7} Ultimately, the matter proceeded to a second trial on February 6-10, 2017. At the second trial, multiple CSX workers who were present on the day of the incident testified. Their testimony included various accounts of hearing a loud noise and seeing the flash of a white car as it barreled down the road and careened into the telephone pole and ultimately the victims. They described appellant's behavior after the collision as erratic, recounting that he climbed out of the car celebrating and yelling "Yeah!" One of the witnesses, Christopher Delano, testified that he went to see if appellant was okay as he was climbing out of the car, and appellant looked at him and said in a "demonic voice," "[T]he devil is my savior." On cross-examination, however, Delano admitted that he wrote in the initial police report that appellant "jumped up and said 'whoo-whoo touch down. I love God. God is my savior.'" The witnesses described that appellant sat down briefly, but then got up and tried to fight with one of the CSX workers. Appellant then took off running down the railroad tracks, stopping only to throw rocks at the workers who were chasing him. Eventually, one of the workers caught up to appellant and struck him in the back of the head with a metal rod. Shortly thereafter, the police arrived and placed appellant in handcuffs in the back of a cruiser.

{¶ 8} While in the back of the cruiser, appellant continued to act abnormally. Appellant did not appear to understand what was going on, and at various times looked around and wanted everyone to tell him that they loved him. Appellant was treated on

5.

the scene for his head injury by medical personnel, and then transported to the emergency room, where his erratic behavior continued. At the hospital, a blood draw was performed to screen for controlled substances, but the test results came back negative.

{¶ 9} On the third day of trial, the testimony transitioned to expert witnesses regarding appellant's mental state. Dr. Daniel Rapport testified first. Rapport examined appellant the day after the incident, on October 29, 2013. He testified that appellant was uncooperative and irritated, but that appellant denied any symptoms of mental illness. Further, Rapport testified that he did not observe any signs of mental illness. Rapport agreed with another physician's finding that there was no evidence that appellant thought on October 28, 2013, that it was right to hit people with his car, and there was evidence that appellant understood that a person could be injured or killed in a car crash, but that appellant was not consciously considering the risk of harm to others at that time.

{¶ 10} Dr. Delaney Smith testified next. She testified that she met with appellant three times at the end of October 2016. Smith opined that appellant was suffering from substance induced psychotic disorder at the time of the offense. Smith reasoned that the diagnosis was supported by appellant's delusional beliefs that he had been chosen by God and was on a special mission to prove his worth, and his admission that in the days preceding the event he used the drugs Ketamine, Lyrica, and LSD. Smith explained on cross-examination that psychotic illness caused by the drugs, Ketamine in particular, can sometimes last weeks. In addition, Smith ruled out a diagnosis of schizophrenia because appellant's psychotic symptoms had completely resolved themselves without medical

6.

treatment, and appellant has not been diagnosed with psychosis over the course of two subsequent psychiatric hospitalizations.

{¶ 11} The defense then called its expert witness, Dr. John Louis Tilley, out of order. Tilley examined appellant in the fall of 2014. Tilley testified that he determined that appellant was disorderly psychotic at the time of the event, and diagnosed him as being schizophrenic. In support of his conclusion, Tilley relied on several factors, including appellant's delusional beliefs that he was receiving special messages from God, and that appellant was experiencing auditory hallucinations. In addition, Tilley considered statements from appellant's mother describing that appellant was acting abnormally in the weeks and days leading up to the incident, as well as statements from appellant's ex-girlfriend that appellant would become weird and say odd things and act bizarrely. Finally, Tilley noted appellant's behavior after the event as described by the CSX employees and the emergency responders.

{¶ 12} Tilley also testified that he disagreed with Smith's assessment. Tilley explained that the evidence did not support a diagnosis of substance induced psychotic disorder because appellant stated that he had not used drugs for a couple of weeks leading up to the event, and specifically stated that for several days before the event he was actively avoiding drugs because it would interfere with the spiritual connection he had with God. Tilley then addressed Smith's disagreement over the diagnosis of schizophrenia, and ultimately testified that regardless of what label is attached to

7.

appellant's diagnosis, the end result is that appellant was decidedly psychotic and met the criteria for "insanity" as it is used in the court system.

{¶ 13} The final expert witness on appellant's mental state was Dr. Jonathan Sirkin. Sirkin interviewed appellant three times in July 2016. Sirkin believed during the interviews that appellant was "malingering," i.e. exaggerating or fabricating symptoms, and so he administered the SIRS-2 diagnostic test, which he testified showed that appellant was indeed feigning symptoms of mental illness. Based on his examination, Sirkin concluded that appellant suffered short-term symptoms of psychosis on October 28, 2013, as a result of voluntary substance intoxication. Further, he concluded that appellant was exaggerating or fabricating his account of psychiatric symptoms prior to October 28, 2013, and that appellant's claimed hallucinations, such as manipulating colors or seeing his teeth melt, were typical of hallucinogen abuse, but almost non-existent in genuine psychotic mental illness. Like Smith, Sirkin noted that appellant has not displayed any active symptoms of psychosis since the event, and conditions like schizophrenia do not suddenly appear one day and disappear completely the next, never to return over the next three years. In addition, Sirkin concluded that on October 28, 2013, appellant had the capacity to understand the wrongfulness of hitting other people with his car, even if he did not intend to hit them.

{¶ 14} Following the medical experts, the state called Lieutenant Christopher Kinn of the Ohio State Highway Patrol as a crash reconstruction expert. Kinn testified that he examined the data recorder contained in appellant's vehicle. It was his belief that the

8.

triggering event that was captured on the data recorder was when appellant's vehicle crashed into the telephone pole, shearing the pole off of its base and knocking it to the ground. The data recorder showed that in the five seconds before the triggering impact, appellant's car started at a speed of 41 m.p.h. and accelerated to a speed of 61 m.p.h. The recorder also showed that the accelerator was pressed all of the way down during this time until three-tenths of a second before impact. In addition, the steering wheel was at approximately zero degrees—pointed straight ahead—until it turned 22 degrees to the right at four-tenths of a second before impact, and 48 degrees to the right at three-tenths of a second before impact. Finally, Kinn was asked about the deployment of the air bag. He testified that in his experience an air bag deflates in about half the time that it takes to inflate. Kinn stated that whenever he was in a crash where the air bag deployed, the air bag did not obstruct his view, and he was able to safely steer the car off of the road.

{¶ 15} After the state finished presenting its evidence, appellant moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. Appellant then took the stand in his own defense.

{¶ 16} Appellant testified that on or around October 16, 2013, approximately four days before his birthday, he took acid, LSD, and Ketamine together because he thought it would help him be more creative in writing and performing his music. According to appellant, he did not take any other drugs between that time and October 28, 2013. Appellant stated that after taking the drugs he had "super sensitive clarity."

9.

{¶ 17} A few days later he was with his nephews and they downloaded a ghost hunter app for his phone that would show a green or red dot wherever there was a spirit. Appellant assumed that the red dot was a negative spirit and the green dot was a positive spirit. Appellant testified that while using the app he felt a spirit's presence and that the spirit was with him.

{¶ 18} A couple of days after the event with the ghost hunter app, appellant was in his room looking up the meaning of his name. Appellant found that his name was connected with a god named Oda, who was a god of magnetic and chemical reactions. Appellant testified that he felt like something was coming into his brain and feeding him information. Appellant then waved his right hand in front of a lamp in his room and saw a green mist fly into the air, which he associated with positive energy. He then waved his left hand and saw a red mist, which he associated with negative energy. Appellant recalled that he played with that light for hours.

{¶ 19} A few days later, on Saturday, October 26, 2013, appellant went to a Halloween party at a local bar. Appellant testified that he had a super sense of preventing bad things from happening, and he sensed that a fight was going to break out. Appellant stated that he intervened and prevented the fight.

{¶ 20} Appellant testified that the next day, he was feeling really good because he had a new sense of clarity and he had stopped the fight the night before. Appellant recounted that he was calling all of his friends, trying to get them to stop doing drugs and to follow him down this good new path that he was on.

10.

**{¶ 21}** On the morning of October 28, 2013, after another night of little sleep—appellant stated that for the past few days he felt so good he could not sleep—appellant testified that his mother wanted him to help her clean out a room and carry things down to the basement. Appellant stated that he knew what she was going to ask him to do before she asked it. He also stated that his mother seemed like she was possessed by some type of spirit or demonic possession. Appellant testified that by saying certain code words such as hot or cold, he could manipulate the spirit inside of his mother. It then appeared to appellant that the spirit inside of his mother could control him through her vision. Appellant realized that he could not let the spirit get ahold of his vision, so he blocked it with a dresser drawer, and only looked at his mother through a mirror. Appellant testified that at the same time, he could see the television through the mirror, and the television was talking to him and laughing at him.

**{¶ 22}** After that, appellant left the house to go uptown to get the tire on his car fixed because the tire kept going flat. Appellant was unsuccessful in getting the tire fixed, so he went back home. When he got home he was looking for his pack of cigarettes in his car. Appellant testified that he put the key in the ignition and felt a warmth go through him, which he knew to be the negative presence. He then lifted his arm rest and found a pack of red Winston cigarettes and red lighter that were not his. Appellant stated that right away he knew that the negative energy, or Satan, was trying to test him, and he knew he was going to pass the test.

11.

**{¶ 23}** Appellant drove down the road a little way and came across a person he knew. Appellant asked the person if he smoked, and the person said "no." So, appellant threw the cigarettes in the gutter, and he knew that he and the other person were both on the good side. Appellant kept driving, and encountered another friend, with whom he always used to do drugs. The friend was carrying a red gas can. Even though appellant's car was out of gas, appellant knew that if he took the gas from his friend he would go do drugs. So, appellant took off. Appellant then drove to a friend's house with whom he used to go to church. Appellant wanted to tell his friend that he realized now that God is real. However, appellant's friend was not home.

**{¶ 24}** Appellant then left the house. He testified that as he was driving away, he felt something come over him, and he no longer had any control of his hands or his body. Appellant stated that he was just sitting there, but the car was driving itself perfectly. Appellant then closed his eyes. When he opened his eyes, the car was still driving perfectly on the road. Appellant closed his eyes again, and kept them closed for longer than 10 seconds. When appellant opened his eyes the second time, he was on a different road. Appellant testified that he saw traffic up ahead, which he believed was trying to block him from getting to his destination, so whatever presence was driving the car shot through the corner gas station. Appellant then came across four barrels blocking the street, and there was a person standing next to the barrels. Appellant asked the person if he could go around, and the person said "alright, go ahead." Appellant testified that all of this occurred on State Route 23 and State Route 6, not in the village of Bradner.

12.

{¶ 25} Appellant next testified that after he passed the barrels, he looked around and everything was beautiful, and there was nothing but nature and birds. Appellant stated that he closed his eyes and grabbed onto the steering wheel, and something came over him that put his foot down on the gas. All of a sudden, appellant heard the car hitting something, but he thought it was Satan trying to get him to open his eyes, so appellant kept his eyes shut, because if he opened his eyes then he would have lost his faith in God being with him. When appellant finally opened his eyes, the car's windshield was shattered, and the airbag had been deployed, but appellant was completely fine.

{¶ 26} Appellant climbed out of the car. He testified that at that point he was so happy because he knew that God was real, he had passed the test, and God protected him. As he was walking around, appellant realized that he might have screwed up a construction site, but he had no idea that he had hit anybody. Appellant then felt people putting their hands on him trying to get him to sit down. Appellant thought that the people were going to try to harm him so he took off running. Suddenly, appellant felt his body go numb and he collapsed to the ground because somebody struck him on the back of the head. Appellant then threw rocks at the people following him, and took off running again. Appellant testified that as he was running he ran right into a police officer.

{¶ 27} Appellant concluded by testifying that he did not intend to harm anyone in any way, and he was not even aware at the time that he had hit someone.

13.

{¶ 28} Following the presentation of evidence, jury instructions, and closing arguments, the jury retired to deliberate. Approximately three hours later, the jury returned with a verdict of guilty as to all counts. The trial court proceeded immediately to sentencing. Again the trial court found that the two counts of vehicular assault merged with the two counts of felonious assault, and the state elected to proceed on the counts of felonious assault. In addition, the trial court found that the two counts of aggravated vehicular homicide merged with the count of murder, and the state elected to proceed on the count of murder. As before, the trial court ordered appellant to serve the maximum prison terms on each count, and further ordered them to be served consecutively for a total prison term of 29 years to life.

## II. Assignments of Error

{¶ 29} Appellant has timely appealed his judgment of conviction, and now sets forth three assignments of error for our review:

> 1. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of the Constitution of the State of Ohio.

> 2. The trial court erred in denying Appellant's Rule 29 Motion for Acquittal at the completion of the state's case in chief.

> 3. Appellant's conviction was against the manifest weight of the evidence introduced by the state at trial.

14.

### III. Analysis

{¶ 30} For ease of discussion, we will address appellant's assignments of error out of order.

### A. Sufficiency of the Evidence

{¶ 31} In his second assignment of error, appellant argues that the trial court erred in denying his Crim.R. 29 motion for acquittal. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 32} Appellant was found guilty of two counts of felonious assault, and felonious assault also served as the predicate offense for appellant's murder conviction. The felonious assault statute provides, "No person shall knowingly do either of the following:  * * * (2) Cause or attempt to cause serious physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). Pursuant to R.C. 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." "It is not necessary that the accused be in a

position to foresee the precise consequences of his conduct; only that the consequences be foreseeable in the sense that what actually transpired was natural and logical in that it was within the scope of the risk created by his conduct." *State v. Rickard*, 6th Dist. Wood Nos. WD-14-016, WD-14-017, 2015-Ohio-3298, ¶ 67, quoting *State v. Losey*, 23 Ohio App.3d 93, 96, 491 N.E.2d 379 (10th Dist.1985).

{¶ 33} Appellant argues that the evidence is insufficient in that while his actions could certainly be described as reckless, there is no testimony that he had a criminal disregard for the risk of any foreseeable consequences. In addition, appellant contends that there was no evidence demonstrating that he knew the victims or intended to harm them, and in fact he was not even aware that he had hit anyone as he exited his vehicle. We disagree.

{¶ 34} First, whether appellant had the specific purpose to injure the victims is statutorily irrelevant. Second, by his own admission, appellant intentionally closed his eyes and pressed down hard on the accelerator. Unless he was insane, appellant must have known that a natural and logical consequence of closing one's eyes and driving one's vehicle at a high rate of speed is that it would probably result in a crash that causes injury to others, which is precisely what happened here. Thus, regardless of the specifics of how the crash occurred and how the victims were injured and killed, appellant acted knowingly.

{¶ 35} Accordingly, appellant's second assignment of error is not well-taken.

16.

## B. Manifest Weight

**{¶ 36}** In his third assignment of error, appellant argues that his convictions were against the manifest weight of the evidence. When reviewing for manifest weight,

> The court, reviewing the entire record, weighs the evidence and all
> reasonable inferences, considers the credibility of witnesses and determines
> whether in resolving conflicts in the evidence, the jury clearly lost its way
> and created such a manifest miscarriage of justice that the conviction must
> be reversed and a new trial ordered. The discretionary power to grant a
> new trial should be exercised only in the exceptional case in which the
> evidence weighs heavily against the conviction. *State v. Lang*, 129 Ohio
> St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 220, quoting *State v.*
> *Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶ 37}** In support of his assignment of error, appellant first argues that the jury's finding that he acted knowingly was against the manifest weight of the evidence. Appellant suggests that the jury did not give proper weight to Kinn's testimony that just before the collision with the telephone pole, appellant turned the steering wheel sharply to the right, thereby showing that appellant attempted to avoid the telephone pole. Further, appellant argues that the collision with the telephone pole caused the vehicle to ricochet out of control and into the victims.

**{¶ 38}** However, even if appellant at the last moment decided to swerve and avoid the telephone pole, such a decision did not negate the risk—ultimately and tragically

realized—caused by his knowing conduct of driving his vehicle at a high rate of speed with his eyes closed. Because the injuries and the fatality that occurred were within the scope of the risk presented by appellant's deliberate conduct, we hold that the jury did not commit a manifest miscarriage of justice when it found that appellant acted knowingly.

{¶ 39} In addition, appellant argues that the jury lost its way when it did not find him not guilty by reason of insanity. To establish his affirmative defense of not guilty by reason of insanity, appellant was required to prove by a preponderance of the evidence "that at the time of the commission of the offense, [appellant] did not know, as a result of a severe mental disease or defect, the wrongfulness of [his] acts." R.C. 2901.01(A)(14).

{¶ 40} Appellant contends that the jury improperly discounted his testimony, and the testimony of his expert witness, Dr. John Tilley. Appellant further contends that the conclusion that he was legally insane at the time of the incident was supported by the fact that there were no drugs found in his system, and he had testified that he did not use drugs for several days prior to the incident.

{¶ 41} Although no drugs were found in appellant's system at the time of the incident, we nonetheless hold that the jury's finding as to his insanity defense is not against the manifest weight of the evidence. Both Dr. Smith and Dr. Sirkin concluded that appellant was suffering temporary symptoms of psychosis as a result of voluntary substance intoxication. Sirkin testified that the symptoms that appellant reported were more consistent with drug hallucinations than with any actual mental disorder. Further, Smith testified that the effects of some drugs, in particular Ketamine, can last for several

18.

weeks. Notably, the hallucinations and delusions that appellant reported experiencing remained consistent from when he ingested the Ketamine, acid, and LSD through the incident on October 28, 2013, yet appellant has not suffered from any diagnosed psychosis since then. Thus, we find that the evidence supports the conclusion that appellant's symptoms were the result of voluntary intoxication. Because "[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense," R.C. 2901.21(E), we hold that this is not the exceptional case where the evidence weighs heavily against the jury's findings.

{¶ 42} Accordingly, appellant's third assignment of error is not well-taken.

### C. Ineffective Assistance of Counsel

{¶ 43} In his first assignment of error, appellant argues that his trial counsel was ineffective for failing to retain an expert witness in crash reconstruction, and for failing to request a jury instruction on the lesser included offenses involuntary manslaughter or reckless homicide. We will address each argument in turn.

{¶ 44} To prevail on a claim of ineffective assistance of counsel, appellant must satisfy the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That is, appellant must demonstrate that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different. *Id.* at 687-688, 694. "The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the

ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* at 697.

{¶ 45} Appellant first argues that trial counsel was ineffective for failing to retain an expert witness in crash reconstruction to further appellant's theory that his actions were not done knowingly. Appellant contends that a crash reconstruction expert's testimony would have explained the initial event of striking the telephone pole, and how the airbag deployment obstructed appellant's vision and ability to control his vehicle.

{¶ 46} We find that appellant's argument does not satisfy the second prong of the *Strickland* test. First, appellant does not identify an expert witness that would have testified that the deployed airbag obstructed appellant's vision and ability to control his vehicle, thereby causing appellant to careen into the victims. Thus, appellant's argument that an expert exists that would have reached those conclusions is purely speculative. Second, as discussed in appellant's second assignment of error, the specific mechanics of how the crash occurred would not disprove that appellant acted knowingly where appellant admitted to intentionally closing his eyes and pressing unrelentingly on the accelerator. Therefore, appellant has failed to demonstrate that the favorable testimony of a crash reconstruction expert would have resulted in a different outcome in the proceedings, and his claim of ineffective assistance of counsel on this point must fail.

{¶ 47} Alternatively, appellant argues that trial counsel was ineffective for failing to request jury instructions on involuntary manslaughter or reckless homicide. The offense of involuntary manslaughter proscribes that "No person shall cause the death of

20.

another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). Likewise, the offense of reckless homicide proscribes that "No person shall recklessly cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.041(A). Both involuntary manslaughter and reckless homicide are lesser included offenses of felony murder. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 190. Felony murder is defined as "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." R.C. 2903.02(B).

{¶ 48} Here, we find that appellant has not demonstrated that he was entitled to the instructions on involuntary manslaughter or reckless homicide. "Even though an offense may be a lesser included offense, a charge on the lesser offense is required 'only where the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense.'" *Trimble* at ¶ 192, quoting *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus. To be acquitted of felony murder, but still found guilty of involuntary manslaughter or reckless homicide, the evidence must reasonably support that appellant did not act knowingly. Here, however, the evidence does establish that appellant acted knowingly. Further, while a successful insanity defense would result in an acquittal on the felony murder charge, it would also result in an acquittal on involuntary manslaughter

21.

or reckless homicide.  Therefore, the evidence does not support an acquittal of felony murder but a conviction for involuntary manslaughter or reckless homicide.  As a result, appellant was not entitled to jury instructions on involuntary manslaughter or reckless homicide, and trial counsel was not ineffective for failing to request them.

{¶ 49} Accordingly, appellant's first assignment of error is not well-taken.

### IV.  Conclusion

{¶ 50} For the foregoing reasons, the judgments of the Wood County Court of Common Pleas are affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgments affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                               _____
                                                                JUDGE
Thomas J. Osowik, J.

                                                       _____
Christine E. Mayle, P.J.                       JUDGE
CONCUR.

                                                       _____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.